The fourth district appellant to the state of Illinois has reconvened. Your Honor, I'm here to see Kavanaugh. Thank you. Please be seated. We'll next call 4-22-0801 Anderson et al. Appellees vs. Nelson Appellant. Counsel for the appellant. Chris Greenblatt, Your Honor. Thank you. For the appellee. John, good afternoon. David Patterson. John, for the appellant. Yes, thank you. Counsel, you may proceed. Thank you, Judge. May it please the Court. Good afternoon, Counsel. Mr. Nelson's first appellate contention is that a new bench and jury trial is warranted because he was substantially prejudiced by the dual representation of Anderson, Wilkins, Laurel, and Nile Anderson while they had a concurrent conflict of interest in violation of Illinois Rule of Professional Conduct 1.781. That rule provides that a concurrent conflict of interest exists if the representation of one client is directly adverse to another client. There's no question that there was a concurrent conflict of interest in this case because plaintiff's counsel represented Anderson who had interests directly adverse to his other client, AWL, concerning the counterclaim alleging that Anderson breached his fiduciary duty by failing to collect the debts that he and entities controlled by him owed to AWL. Anderson acknowledged these debts, these loans at trial, but he claimed that he paid them back between 2004 and 2009. In sharp contrast, in 2018, AWL's former receiver, Bruce Breitweiser, filed proofs of claims in Anderson's bankruptcy case swearing that Anderson or entities controlled by him owed AWL over $2 million. Plaintiffs argue that any conflict between Anderson and AWL was eliminated in 2017 when the circuit court granted the receiver's motion to decline further pursuit of litigation on behalf of AWL. That motion did mention the receiver's intent to allow Anderson or Nelson to pursue any claim that AWL might have on a derivative basis, but the order states only that the motion is granted without objection and makes no mention of any shareholder derivative actions. It's also important to note that the conflict of interest can't be eliminated by a derivative shareholder action that neither Nelson nor Anderson filed seeking to recover the debts of AWL. Nelson counsel states that a necessary element is proof of substantial prejudice here and points to the fact that the trial court reduced Anderson's damages for any amounts diverted by Nelson and that would then effectively negate any claim of substantial prejudice. So what do you say to that? Your Honor, Nelson suffered at least two forms of substantial prejudice as a result of the conflict of interest. The first was the money that the jury believed Nelson diverted from AWL was awarded to Anderson instead of AWL. The second was that Nelson's breach of fiduciary duty claim with respect to the unpaid loans was compromised. The question that the circuit court asked Nelson's counsel at the hearing on the post-trial motion was about the first form of prejudice. It wasn't about the second form of prejudice. So the dual representation of Anderson and AWL substantially prejudiced Nelson because conflict-free counsel representing AWL would have called AWL's former receiver at trial and introduced the proofs of AWL's claims in Anderson's 2018 bankruptcy case. Excuse me, counsel, but could not Mr. Nelson have introduced Mr. Breitweiser's testimony as well? He could have, Your Honor, but he and his counsel determined as a matter of trial strategy that it wasn't prudent. He did indicate that he was willing to call him as a witness and then ultimately declined to do so, so that opportunity was there. So how can you argue that he's prejudiced if he elected not to pursue that avenue? Well, Mr. Nelson's position is that it was to his strategic disadvantage to call the receiver, acknowledging that he had the chance. But that doesn't take away the problem of the conflict of interest. Had AWL had conflict-free counsel, he or she most certainly would have called the receiver to introduce the proofs of claims that the receiver filed in the bankruptcy in 2018, years after Mr. Anderson claimed that he paid those debts back. And I mentioned that there was more than or there's at least two forms of substantial prejudice as a result of the conflict of interest. The conflict of interest permeated the entire trial. AWL's conflict-free counsel would not have jettisoned AWL's conversion claim in favor of Anderson's claims. AWL has substantial tax liability. In fact, it's alleged to be in excess of the verdict returned in this case, and no one was looking out for AWL's interest at trial. AWL's conflict-free counsel would have argued that no money goes to Anderson until that tax liability is satisfied. And if claims are correct, Mr. Nelson has potential personal liability for that tax liability because being the officer responsible for preparing and filing those returns. Now, Mr. Nelson disputes that. He maintains that he and Mr. Anderson were equally responsible for that. But this is just another way that Mr. Nelson was substantially prejudiced by the conflict of interest because arguably none of the money that was diverted from AWL should have gone to Mr. Anderson. But there was no conflict-free counsel for AWL at the trial to make that argument on behalf of AWL. So Nelson was prejudiced because of the compromise of his counterclaim based on the unpaid loans and based on the potential tax liability. Accordingly, it's Mr. Nelson's position that a new trial is warranted. Mr. Nelson's second appellate contention is that a new bench trial is warranted because the circuit court abused its discretion in sua sponte, ruling that the counterclaims were barred by the affirmative defense of unclean hands, which was neither pled nor argued, and to which Mr. Nelson had no opportunity to respond. This appellate court in Columns v. Department of Health and Family Services explained that affirmative defenses ordinarily must be pled or they're forfeited. Plaintiffs argue that the circuit court was permitted to sua sponte, apply the doctrine of unclean hands, citing the American National Bank and Trust Company of Chicago case and the Gambino v. Boulevard Mortgage Corporation case. But as explained in Mr. Nelson's reply brief, neither case stands for that proposition. In any event, the court in Collins did acknowledge there are certain circumstances where a circuit court should raise an affirmative defense sua sponte, but those circumstances aren't present in this case. For example, where the public has an interest in the outcome of the case. But even then, the court emphasized that the party against whom the doctrine is being applied still must be given an adequate opportunity to respond. And in this case, Mr. Nelson wasn't given that opportunity. Mr. Greenblatt, would you agree, or let me just ask you an open-ended question here. Is there any Illinois authority that bears on the question whether or not a trial court can invoke the unclean hands doctrine sua sponte? There is, Your Honor. Mr. Nelson would cite Jameson Real Estate LLC v. Amag. This is at 2018 ILAP 1-171534, paragraph 85. The appellate court held that the doctrine of unclean hands is an affirmative defense that ordinarily must be set forth in the answer to the complaint, and the defense is forfeited if not raised in a timely fashion in the trial court. That's not a holding that says that a trial court cannot apply the doctrine of unclean hands sua sponte. It doesn't say it one way or the other. It just was an observation that the trial court had done that in that case, isn't it? Well, I think that's right, Judge. But that's the same with respect to these two cases cited by the plaintiffs. In American National Bank and Trusted. Assuming that to be the case, and then go back to my original question, is there any Illinois authority that answers the question, can a trial court sua sponte invoke the unclean hands doctrine? Or is this a case of first impression? No, Judge. The Collins case is authority for that. The Collins case says that there are certain circumstances where it can be raised sua sponte, even where it's not pled. But the court explained that even in that event, you still have to give an opportunity to the person against whom the defense is being applied to respond. So the answer to your question is there is authority. You're saying Anderson? Collins. Oh, Collins. Excuse me. The Collins case is authority for Mr. Anderson's view of this? It's authority that states that there are certain circumstances where it can be raised sua sponte by the circuit court. Then going to your other point, which is in your brief you asserted it as a due process claim, that Mr. Nelson did not have an opportunity to respond to it. He did address it in his post-trial motion. Is that right? Sure. Is that an opportunity to address it to satisfy due process? Well, I mean, by then it was too late and he didn't get relief. And by addressing it, he explained that it didn't apply and that was rejected. And he's here today asking you to reverse that, asking this court to reverse that. Okay. He did bring his argument, did make his argument to the trial court, albeit after trial. But you're saying that would be insufficient to satisfy due process? That's correct, Judge. Okay. Thank you. Had Glenn been afforded the opportunity to address the unclean hands defense, he would have argued, he would have cited the Gambino case for the rule that the doctrine of unclean hands is unavailable where the act giving rise to the defense does not directly involve the transaction, which is the subject of the litigation. And he would have argued that there's no evidence that he engaged in any misconduct in the form of bad faith or fraud relating to the transactions underlying the Wasserman deal or the unpaid loans breach of fiduciary duty counterclaims. This lists several instances of purported misconduct on Nelson's part, which face names show his unclean hands with respect to the subject matter of the litigation, but none show that Nelson engaged in any misconduct with respect to the Wasserman transaction or the unpaid loans counterclaim. So the issue turns on the meaning of directly involved the transaction, which is the subject of the litigation. The Gambino case demonstrates that the misconduct must relate directly to the transaction, which is the subject of the claim to which the unclean hands defense is being applied. In Gambino, there was an action to quiet title to three separate properties. They were identified as the Niles property, the Kedzie property, and the La Verne property. The trial court filed for the plaintiff Gambino on each of his separate claims to quiet title to each of those properties. On appeal, one defendant, Plaza Bank, argued that the unclean hands defense barred plaintiff's action with respect just to the Niles property. The appellate court reiterated the rule, or stated the rule, that the doctrine is unavailable, where the act giving rise to defense does not directly relate to the transaction, which is the subject of the litigation, and then concluded that the purported misconduct could not be used to reverse the trial court's judgment quieting title to the Niles property, because the actions giving rise to Plaza Bank's unclean hands defense did not involve the Niles transaction. So Gambino makes clear that the acts giving rise to the unclean hands defense must directly involve the transaction, which is the subject of the claim to which it's being applied, not misconduct that's been identified by plaintiffs that relates to other claims or the case in general. Alternatively, plaintiffs argued that any error in sua sponte raising the unclean hands defense was harmless because Mr. Nelson failed to prove his counterclaims. This argument is without merit for two reasons. First, plaintiffs cannot be heard to argue that Nelson failed to prove his counterclaims, where the circuit court expressly found that Anderson breached his fiduciary duties to Nelson. Second, there's no dispute that these men are fiduciaries to one another, and any transaction involving them both or one profits is going to be presumed fraudulent, and the burden is on the profiting fiduciary to prove by clear and convincing evidence that the transaction was fair and equitable. So the burden was on plaintiffs, not on Nelson, to prove or to show the fairness of Anderson's conduct with respect to the Wasserman transaction and the unpaid loans. So for those reasons, Mr. Nelson's contention is that a new trial on his breach of fiduciary duty claims is warranted. Nelson's third appellate contention is that portions of the jury's verdict awarding damages for lost benefits, damage to credit, and emotional distress were against the manifest weight of the evidence that must be vacated. Mr. Nelson would like to focus on the $1.5 million awarded for Mr. Anderson's purported emotional distress. In his post-trial motion, Mr. Nelson argued that Anderson's testimony, that Nelson's conduct, quote, set him off, and he, quote, did not know how to deal with it, was wholly insufficient to support $1.5 million in damages. The circuit court found that there was additional evidence to support the emotional distress damages, referencing Mr. Anderson's testimony that his home was in foreclosure and that he could not even get a checking account. But these are just economic consequences of Nelson's conduct, not evidence that these economic consequences caused any emotional injury. This is in sharp contrast to the Holland v. Schwann's home services case, where there was sufficient evidence to prove that defendant's conduct caused economic consequences, which in turn caused emotional injuries. In that case, there was evidence that the defendant's conduct caused foreclosure of the plaintiff's home, resulting in embarrassment and a sense of failure. That defendant's conduct caused repossession of his car, resulting in embarrassment. Defendant's conduct caused loss of medical insurance, which caused stress and anxiety. And defendant's conduct caused his wife to get a second job, resulting in shame and a sense of failure. May I ask a question in regards to the emotional distress award here? And it's basically two parts. Is there any case law that says that there must be some physical manifestation that accompanies the claim of emotional distress so that without the evidence of a physical manifestation, a jury may not award damages for emotional distress? Your Honor, there's no requirement that there be a physical manifestation of the emotional distress. When we're talking about damages, emotional distress is damages, not to be confused with the tort of intentional infliction of emotional distress or negligent infliction of emotional distress. However, that is the most typical way that it's proven, that and going to therapy. Well, that segues to my second question then, which is, are there any cases that have been cited here in the briefs where a jury's award of emotional distress damages in the absence of evidence of physical manifestations was upheld? So no evidence of physical manifestations, an award of damages for emotional distress, and that award was upheld. Not that come to mind. Okay. Thank you. So Mr. Nelson acknowledges that economic consequences can sometimes result in emotional injury, but Anderson did not testify that they did in his case. It was his burden to do so, and therefore the portion of the verdict awarding $1.5 million for emotional distress was against the manifest way of the evidence and must be vacated. Alternatively, in the event that the court determines that there was sufficient evidence to support the emotional distress damages, Nelson contends that the $1.5 million exceeds the limits of fair and reasonable compensation and shocks the judicial conscience. Counsel, if I can interrupt just one quick question. Did he make the request for the remitter of the jury's award for emotional distress in his post-trial motion? He did not, Your Honor. However, careful examination of plaintiff's brief will reveal that they don't argue that we waived it. Mr. Nelson's position is that they've waived the waiver with respect to that issue. Thank you. The fourth appellate contention is that the trial court abused its discretion in denying his motion for remitter of punitive damages because it did not properly evaluate the enormity of the wrong factor. By failing to consider its own reduction by half of the compensatory damages for money diverted from Mr. Nelson, from $1,351,000 to $675,500. What about as that reduction was compared to the total amount of compensatory damages, not just for that one line item? How much of a reduction in the total award compensatories did that represent? Obviously much less.  The total verdict was 5.7 and then reduced by that 6. And why couldn't the jury, even though the reduction occurred by the trial judge after the fact, why couldn't the jury have made that same determination in its mind when it was considering the damages, that half was for, you know, that it was only half? I mean, what would keep them from believing that half would go to Nelson and half would be assigned to Anderson? Well, they awarded it all to Mr. Anderson. They were instructed that the amount of punitive damages must be reasonable and in proportion to the actual and potential harm suffered by Mr. Anderson. We presume that the jury followed the circuit court's instructions. They didn't know about this subsequent reduction. Obviously the verdict came before that. And consequently the jury surely would have assessed less punitive damages had they known that the true amount of money wrongfully devoted from AWL was half of what they assessed. And now obviously that's a discretionary issue, but because compensatory and punitive damages are correlated, as was recognized by the United States Court of Appeals for the Seventh Circuit in the Baird v. Wexford case and also recognized in the Levy Heights case by this court, the reduction in punitive damages must be proportionate to the reduction in compensatory damages. Counsel, I believe you've answered the question. Any further questions? No. Thank you. You have time, everybody. Thank you. Okay. Please. I apologize. It's been a while. Do I refer to the court as judge or justices? I didn't hear the question. I apologize. It's been a while since I've been in the appellate court. Do I refer to you as justice or judge? I don't have a strong opinion. Okay. Be either or. All right. Thank you. My name is Daniel Conestag, and I do represent Mr. Anderson in the appeal here. May it please the court and counsel, thank you. The issue that you raised in terms of the conflict is one that I addressed with Judge Steinis in the trial court. When it was initially raised, judges, it was raised as a 1.9. And the record will show that when they initially tried to disqualify me, it was because I had previously represented the receiver, Mr. Breitweiser. And so they said that I came in the day of trial and that therefore I had a 1.9 issue based on a conflict of interest because somehow I was in representing Anderson, I could be antagonistic to Mr. Breitweiser if he testified. And Mr. Breitweiser never testified in the trial. It never became an issue. What they argued here thereafter is more of now they switch and they say, well, it's a 1.7. It's a concurrent because of my representation of both Anderson and AWL. But you saw where he went when you addressed it to him. Well, who's the prejudice to? The prejudice isn't to AWL, and it's not to Anderson. At the time I came into the case, the Fifth Amendment complaint had already been filed back in 2016 of December. The trial was in 2018. So this Fifth Amendment complaint had been in existence. I wasn't in the case. It was another counsel who was representing both AWL and Anderson, which would be the same conflict that they're asserting here, right? I mean, whoever under their theory is representing AWL and Anderson in that case would have a conflict, if you accept their theory under 1.7. They never raised it, ever, until I showed up on the day of trial. And they said, well, now I have a conflict. And they could not articulate a reason to Judge Steinis at the time, and so the case proceeded. Now, under the new theory that they're pursuing under 1.7, 1.7 is very clear that I would have to be representing a client directly adverse to another client. In other words, I'm on one side of the V in the other. That didn't happen here. AWL and Anderson had a concurrent goal, a mutual goal, to recapture the millions of dollars that Mr. Nelson had taken from the corporation. And I understand and I heard you when I was sitting over there, the facts you've read and you've seen what was done here by Mr. Nelson. For a course of years, going back to 2002, all the way until finally the judge ousted him in 2012, diverting proceeds, commissions that belonged to AWL. So there was a mutual goal between AWL and Anderson to recapture this money. Anderson, by virtue of the court order in 2017, had sole control over that corporation. So if there was a conflict, which I do not agree, there was zero conflict, Anderson had the right to waive under Rule 1.7. I had the right as counsel to decide whether or not my continued representation would diminish my ability to represent my clients, and it did not. In fact, the outcome was, I think, very good in the circumstances. So the conflict did not exist. The court took care of it, and it was interesting in that argument where the judge says, well, if I take away a portion of the amount diverted, and Judge Harris, you were asking about this, the irony, and I hope it doesn't pass by here, the irony is, so what happened is when the jury decided to award that amount of diverted funds, the man that diverted it got a credit. That makes the conflict and the alleged prejudice completely vanish, and I thought Judge Steinis at the time when he recommended that, I told him it was Solomon. I thought it was a good idea and a good approach to address the issue. So once that's addressed and taken care of, now they come in with these two other ideas. They say that the breach of fiduciary duty that Nelson was bringing against Anderson, so it's Nelson's counterclaim for breach of fiduciary duty against Anderson. They say I somehow prejudiced that. I have no idea, and I'm still trying to understand the logic, but the counterclaim, if Nelson felt that he had one, and he wanted to add this idea that Breitweiser filed some sort of bankruptcy and listed some monies that were taken, he had every right, not at the time of trial, because by that time the pleadings are set, but since 2010, to file some sort of claim, he never did at any opportunity, even when the court gave the reins back to both the shareholders and said either one of you can file a derivative action. By 2018, it was too late. I doubt very much a trial judge on the eve of trial was going to let him try to bring in this bankruptcy. And by virtue of the motion in limine where he said that's not coming in, I think the writing was on the wall there. The last thing that he argued is this conversion claim that AWL had for tax liability. That wasn't argued in the briefs, but I want to address it because it's, again, the irony is I hope it's clear. That company did not pay taxes on millions and millions and millions of dollars for close to 12 years. It was undisputed at the trial and conceded by Nelson that he was the one responsible. In fact, he was able to take control of the company back in 2010 when Anderson was ousted by submitting an affidavit to support a preliminary injunction to oust Anderson. In that affidavit, he specifically said under penalties of perjury that he had filed, prepared and filed tax returns. That did two things. One, it caused Judge, I think it was Judge Steinesville at that time, if I'm wrong, I apologize, to issue a preliminary injunction throwing the founder of this company out, number one. But number two, allowing Nelson to take over. But in those tax returns, and I hope it didn't go unnoticed because at the trial, I pointed out to the jury, in 2007, $977,000, $977,000 was diverted from AWL on commissions where Nelson specifically filled out applications for insurance and said, send the money to me, not to AWL. He filled out a Schedule C for his sole proprietorship, shows the $977,000, and this is what our forensic accountant pointed out, but it was obvious in the documents. In paragraph 42 of the Fifth Amendment complaint is an admission about the false expenses and employees, ghost employees that were reported in the tax returns. But I want to focus on the year 2007 in particular because it's the most egregious. So when this tax return is done, he doesn't report the Schedule C income to himself. He shifts it to these fraudulent tax returns. And then in the expenses, he said that he had staplers, paper pads, yellow paper pads. If I get it wrong, I apologize, but I think it was $276,000 for the amount of supplies and then $400,000-something related to temporary employees. There had never been a temporary employee in that company. And he did it to hide the $977,000. What's my point? I hope I haven't lost everybody. The point being is that so on this third thing where he says, well, AWL could have pursued a claim against Nelson, the fraudster, for the tax liability that the company had. It makes no sense. And how that would benefit AWL in the circumstances, I'm not sure. I'm still scratching my head on that one. But that's a new argument, and I thought it was interesting to point out the irony of it. Can I ask a question here? It just relates to the amount diverted from AWL. It's unrelated to what you were just talking about, but I want to go to the jury's verdict. Yes. What did the verdict form actually say? Did it say amount of money diverted from AWL? How did it read? Sure. Your Honor, it read like this. I'm just going to talk about the portion regarding diversion. Is that the portion you're asking? Yes. It says the amount that they awarded, $1,351,000. Yes, Your Honor. Exactly. So it says the amount of money diverted by Nelson, $1,351,000. But that related to AWL, and that's what was argued? Yes. Well, no, Your Honor. I had argued for $2 million. And I'm sorry, but it was argued that the money was diverted from AWL. Yes. By Mr. Nelson. Yes, Your Honor. Okay, thank you. Okay. Counsel, if I may, quickly, since we're talking about the numbers there. The amount that was awarded, the $25,000 for the damage to Mr. Anderson's credit. Yes. Was that number simply arrived at because it was a suggestion by counsel, or was there specific evidence in the record that would provide a reasonable basis for that determination? Justice, it was my statement to the jury. And it was made at $25,000, that number, because I felt based on the experience of the jurors. You know, we've law dared them, the 12 people that decided this case. And I thought, okay, a credit rating, you know, $25,000 seems to me a reasonable figure for somebody who has room credit. Frankly, it's probably a lot more, but I thought $25,000 is a fair and reasonable number in that circumstance. And I did cite to Judge Steinis the cases that say, I don't need to come in with the evidence that the jury can hear that Andy Anderson's credit was destroyed. I mean, it was destroyed. He couldn't open a checking account. So I thought $25,000 in that circumstance as judge was fair and reasonable. I don't have a – I'm not seeing a time, how much I have left. The light will show you when you have minutes left. Oh, how many minutes? Five minutes left. Two minutes left. I don't think it's gone off yet, so you have time. Can I jump to those figures? Because I really think that's the crux of some of the arguments. The damage for the emotional distress experience, Justice, you asked, or somebody asked, it was not raised in the post-trial motion. Their fight was it's not. The case law doesn't allow it. We established through the Ken Gemme case that the inner fraud action, if there are other damages associated with the claim under Ken Gemme, C-A-N-G-M-I, that you can seek under those circumstances emotional distress damages. In fact, if you look at the Kim and Widener case, they both go back to Ken Gemme, and they recognize that if there are other damages associated with the conduct that occurred, that you can seek emotional distress. Judge, you asked if the physical injury needs to be a portion of that. The Thornton case by the Illinois Supreme Court said once and for all, you do not need to have associated physical injury in order to seek emotional distress, and it recognized that certain people react different ways. In fact, in the Thornton case, the Supreme Court was very specific and said that is really a function, and it should be. You cited cases that dealt with, I think, a different claim for emotional distress damages, Ricky and so forth. That's not the point I was getting at. Mine was in order to justify a substantial award of damages for emotional distress, must there be some evidence of physical manifestation that would support the amount, not whether emotional distress damages could be awarded, but the sufficiency of the evidence supporting a very substantial award. That's what I was getting at. Okay, and then to answer your question, I think counsel would agree there is no case directly on point that addresses that subject matter. Okay. You would agree that the cases that have been cited, those that involve significant awards that the appellate court commented on approving layout, those involved cases where the plaintiff also had some significant physical troubles. To be sure, your case in Max Miller, I mean, I think the poor person lost both legs. I mean, so everybody, I think, would agree be emotionally distressful. Having said that, the Holland case I thought made a comment that addresses the concern that you may have, and they said, you know, not like a work comp type case, is can you compare what happened to Niall Anderson to Miss Maximilian? If I'm pronouncing it wrong, I apologize. And the Holland court said the courts won't compare cases to determine whether or not a particular award is excessive, and it makes sense because the jurors are deciding. It is such a fundamental right in this state that jurors decide these issues. If you could have been there and seen these 12 people work on this case, they got to observe, and they did. This is when the pandemic was just ending. They all collectively decided to remove them masks, and the witnesses didn't have to wear them masks, and they got to see Niall Anderson essentially naked on a witness stand talking about what happened, not just one time, but over the course of years, where he has not since September 2008 had an income, had health insurance. He has his house foreclosed. He had where his business office was foreclosed. He had no health insurance for a wife that had ovarian cancer. He is begging and borrowing from neighbors and friends. They got to see a man broken. Now, the record that you have, and I understand that what we have is nobody's fault, but if you could have seen what the jury saw, and that's the distinction, Judge, when it comes to how do we distinguish Ms. Maximilian from Niall Anderson, you can't. Well, hypothetically, and let me just ask you this. He had the exact same conduct that was testified to on the part of Mr. Nelson  but there was no testimony by Mr. Anderson as to emotional distress. No testimony that specifically would be in response to a question, did you suffer emotional distress. If, in closing arguments, you made a request for damages for emotional distress, could a jury, in the absence of the evidence that I'm talking about, make such an award? Your specific response to your question, I don't believe that if they did, that that would be supported. I don't think in the trial court would let it if it wasn't something that was pursued. So you'd have to have testimony by Mr. Anderson indicating that he did suffer emotional distress. I agree with that. And you've laid it all out there in your brief as to what the extent of that evidence is. Is that right? Yeah, and extent is a word I don't want to concede to and only because of this. Because you can't get the extent unless you were there. The Thornton case by the Supreme Court specifically says the jury can absolutely use their own background, their own experience in life, just like the instruction says. They were there, they saw. That transcript where Mr. Nelson goes, it was difficult, and there's dash, dash, dash, it was difficult. You had to be there to see a 61-year-old man at that point. It was moving. And so we did present the evidence. He may not be eloquent, but he is for real. That award, I did not suggest on how much. I purposely decided not to because I was in Whiteside County. I saw the people that were on the jury. It is their community, not mine. They decided. They decided that punitive damage award. They did. I did not suggest a dime. I said, I am leaving it to you. This is exactly why we can protect this jury system. There is nothing untoward, nothing corrupt, nothing outrageous that happened here. It is human beings, 12 of them, reaching a collective decision that they were proud of at the end of this. I presented the evidence. Mr. Anderson was there. They saw him. This verdict, if it's upheld by this court, will say a lot. You have an opportunity here to set something straight in this case and in future cases as it relates to this emotional distress. It's an opportunity. Thank you, counsel. You are out of time. Do you have any other questions? I'm sorry. I'm very sorry. I do, and with the indulgence of my colleagues. Please. This doesn't relate to damages, but it relates to the unclean hands down. Very simple question. The opposing counsel indicated that the Collins case would support the trial court's authority to apply the unclean hands doctrine sua sponte. I read the Collins case. I'm not sure that I agree with that, but that would actually, I think, work to your benefit in this case. But do you agree that Collins says that? I do, but can I cite one more case? I know I'm over time. Go ahead. This American National Bank that we cited, that stood for the proposition. The judge doesn't need to say unclean hands. He could just say it's a court of equity, which is what Judge Steinis did. If you read his initial ruling, he goes, I think there's a doctrine out there that I recall regarding unclean hands. Judge, he was doing it based on the conduct that he found that each of the parties engaged in. Okay. I'm just only asking about Illinois authority on this. Those two cases, Judge, I would say yes. Thank you. Thank you. Thank you. One more question. One more. Counsel, I'm sorry, but just on page 18 of your brief, I believe you indicate Mr. Anderson stated that his reputation had been destroyed in the small community. And was that not in response to a question as he was trying to respond to a question about having been caused emotional distress? Yes. And I believe in that he used the reference to representation versus reputation. But your statement here is that that was the context of that response. That's correct, Your Honor. Thank you. Thank you, Counsel. Drink blind or both? With regard to the misciting of the rules of Illinois, Illinois rules of professional conduct, I took a look back at our motion for new trial, Nelson's motion for retrial. Mr. Conasec's right, we incorrectly cited Illinois rule of professional conduct 1.8 and 1.9a. But we would argue that that's not pertinent because the argument was set forth plainly that plaintiff's counsel was permitted to represent two parties with adverse interests in contravention of the Illinois rules of professional conduct, followed by the wrong citation. But we corrected that in the subsequent argument and in our briefs before this court. We would contend that that's insignificant, that we cited the wrong rule. And I can direct the court's attention to Common Law Record Volume 7 at 8609 is where that argument is in our Mr. Nelson's post-trial motion. With respect to the emotional distress issue and the, I didn't necessarily appreciate Justice Harris's question about the, although I'm not going to change my answer because I'm not aware of a case, but the point is well taken that if there's not physical manifestation, and we would argue professional help from a therapist or psychiatrist or something like this, that the severeness of the emotional distress is not demonstrated. And certainly not enough to support a $1.5 million award for emotional distress based on the scant evidence that Mr. Anderson presented during the trial. And to put more of a point on that, the plaintiffs have identified excerpts of Anderson's testimony, which according to them supports the $1.5 million. But close examination of those excerpts reveals that they're not evidence that Anderson suffered an emotional injury as a result of Nelson's conduct. For example, Anderson testified that when he learned that AWL's tax returns had not been filed, that he was worried that an IRS agent would knock on his door. Being worried could be equated with anxiety, which is a recognized form of emotional distress. But careful review of that part of Anderson's testimony reveals that he never said he was worried. And this is at reported proceedings pages 1193 through 1194. In fact, at no point during his testimony did Mr. Anderson say that he was worried. Do we have to hear the words that he was worried if, in fact, he fears the tax man knocking on his door? Is that a magic word? Well, I think that, yes, I think he needs to testify to some recognized form of emotional distress. And he hasn't. Plaintiff's assertion that Anderson testified that he's desperate is another example. But if you look at that excerpt from the testimony, it's unrelated to Nelson's conduct. But instead it was related to debts that Prep Sports Incorporated, or PSI, owed to entities other than AWL. And Anderson's testimony that being locked out of this company that he founded was difficult is also not evidence of emotional injury that would support emotional distress. In making this argument, are you conceding that if you heard the magic words or was in the record, worry, emotional distress, was suffered? Is that enough? I don't think it's enough, Your Honor. I think that there has to be some sort of evidence explaining why that is rather than an utterance of a single word in the midst of thousands of pages of testimony. And this would have to be some type of expert? No. I think it's clear from Thornton that expert testimony is not required. Counselor, if I may. Other than Mr. Nelson's conclusory statement around 2010 that Anderson, Mariah, PSI, and PSO owed unspecified amounts of money to AWL, what other evidence is in the record supports that claim or demonstrates that at the time of the trial the debts had not been paid? Your Honor, I would direct the court's attention to page 30 of Mr. Nelson's opening brief where we set forth testimony of Mr. Nelson. But my question is other than Mr. Nelson. Other than Mr. Nelson. Documentation. Well, obviously the proofs of claims. But those were not admitted. I guess I'm asking what's in the record other than Mr. Nelson's own statements that those debts were owed? Or what else is in the record to establish that they were still owed at the time of trial? Nothing. Thank you. You're out of time. Did you have a final statement summing up your rebuttal? Another thing to consider, Your Honors, with respect to the new trial and the breach of fiduciary duty claims and showcasing why the conflict of interest is front and center to that issue, is that the trial court's unclean hands ruling did not resolve AWL's breach of fiduciary duty claim that was submitted to the court for decision. AWL is a corporation that doesn't have hands to be soiled. And in the face of that claim not being ruled on, plaintiff's counsel was silent, demonstrating his conflict and preference for one client over another. So we would submit, Mr. Nelson would submit, that that's another reason why retrial on the breach of fiduciary duties is warranted. Thank you, counsel. Thank you. Thank you, counsel. Thank you both. Well-argued case. Court will take this matter under advisement. We now stand on recess.